UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN C. SLICK,

     Plaintiff,                         Civil Action No. 07-13521

v.                                  HON.  PAUL D. BORMAN
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff John C. Slick brings this action under 42 U.S.C. §405(g) challenging a final

decision of Defendant Commissioner denying his application for Disability Insurance

Benefits under the Social Security Act.   Both parties have filed summary judgment motions

which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §

636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's Motion for

Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be

DENIED.

## PROCEDURAL HISTORY

Plaintiff original application for disability benefits, alleging an onset of disability date

of March 27, 1996, was denied initially and on reconsideration in early 1997 (Tr. 39).

Plaintiff did not request an administrative hearing (Tr. 39).  He filed a second application on

October 7, 1998, again, alleging an onset date of March 27, 1996 (Tr. 39). After the denial of the second claim, Plaintiff made a timely request for an administrative hearing, held on March 17, 2000 in Oak Park, Michigan (Tr. 39). Administrative Law Judge ("ALJ") Helen G. Cropper presided (Tr. 39). Plaintiff, represented by Bruce Jackson, testified, as did Vocational Expert ("VE") Dr. Peter Fotiu (Tr. 39). (Tr. 39). On June 21, 2000, ALJ Cropper determined that Plaintiff was not disabled, finding that he retained the ability to perform his past relevant work as an academic service officer as well as a significant range of semi-skilled light and sedentary jobs (Tr. 54).

Plaintiff again applied for Disability Insurance Benefits ("DIB") on April 30, 2004, alleging disability as of June 21, 2000 (Tr. 71). After the initial denial of his claim, Plaintiff requested an administrative hearing, held in Oak Park, Michigan on August 8, 2006 (Tr. 369). ALJ Michael F. Wilenkin presided (Tr. 369). Plaintiff, represented by Kenji S. Zweygardt, testified (Tr. 372-386). On October 11, 2006, ALJ Wilenkin determined that Plaintiff was not disabled, finding that through his date last insured ("DLI") of December 31, 2001, he retained the ability to perform semi-skilled light work, including his past relevant work as an academic service officer (Tr. 27). On June 29, 2007, the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review of the final decision on August 21, 2007.

## BACKGROUND FACTS

Plaintiff, born February 2, 1946, was age 60 when the ALJ issued his decision (Tr. 71). He graduated from college and worked previously as a academic services officer (Tr. 88, 94). Plaintiff alleges disability as a result of bipolar disorder (Tr. 24).

### A.    Plaintiff's Testimony

Plaintiff testified that he graduated from college in 1970 and later completed credits toward a Master's degree (Tr. 372).  He reported holding jobs as a surveyor for the highway department, director of the art foundry at Wayne State University, and "chief curator of the gallery at Wayne State University" (Tr. 372).

Plaintiff testified he had been treated for psychological problems by Dr. Arthur Hughett, M.D. for the past four years, adding that he had received "advanced counseling services" for nine years (Tr. 373).  He reported that  he had been admitted to an outpatient program for treatment related to his bi-polar disorder in April, 2001 , then in October, 2001 received 10 days of inpatient care (Tr. 373-374).  Plaintiff also testified that he was a recovering alcoholic (Tr. 375-376).

Plaintiff testified that his illness was cyclical, typically allowing him to be "productive" for a month, followed by two months of "a manic period," and then six to nine months of depression (Tr. 378).   He indicated that during his manic periods, he exhibited poor judgment, uncontrolled spending, and erratic sleeping habits (Tr. 379).   Plaintiff testified that his depressive episodes were characterized by lethargy and suicidal ideation (Tr. 377, 381-382).  He denied ever attempting suicide (Tr. 382).

Plaintiff testified that he also experienced seasonal affective disorder (Tr. 383). He reported that he took his medication as prescribed, adding that his wife reminded him to take his medication everyday (Tr. 383-384).  He denied psychosis, but alleged that his physician and acquaintances thought that he was psychotic (Tr. 384-385).  Plaintiff opined that the two

hospitalizations in 2001 did not improve his condition (Tr. 384).

### B. Medical Evidence[1]

### 1. Treating Sources

In October, 1997, Plaintiff sought treatment for bipolar disorder (Tr. 272). He reported that he had experienced mood swings "since early adulthood," indicating that the depressive episodes were worse than manic ones (Tr. 272). Plaintiff, stating that he was originally prescribed antidepressants in the early 1980s, claimed that he did not experience manic episodes until after taking the antidepressive medication (Tr. 264). Evaluation notes state that Plaintiff "is above [average] intelligence, has good verbal skills, appears to have appropriate support system [at] times, [and] appears motivated" (Tr. 269) Biweekly counseling was recommended (Tr. 270). Plaintiff received a GAF of 52[2] (Tr. 269). Treatment notes from the following year indicate that Plaintiff was prescribed Wellbutrin and Lithium (Tr. 261-263).

In August, 1999, Plaintiff told his therapist that he had stopped taking both antidepressants and Lithium, stating that he believed the Lithium was responsible for thyroid problems (Tr. 260). In April, 2001, Plaintiff received outpatient hospital care after

---

[1]

Plaintiff's current DIB application is limited to the determination of whether he was disabled between June 21, 2000 and December 31, 2001. Treating records created from January, 2002 forward are discussed for background purposes.

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school function. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision* at 34 (*DSM-IV-TR*), 30 (4th ed.2000).

experiencing confusion, paranoia, anger, depression, and suicidal ideation (Tr. 166, 254).

Haresh S. Mehta, M.D., noting at the time of admission that Plaintiff's judgment was "poor,"

assigned him a GAF of 35-40[3] (Tr. 167). Plaintiff's treatment plan included participating in

"all milieu activities including social work groups in order to enhance his functioning and

provide him with structures, education, and support" (Tr. 164). May 4, 2001discharge notes

show that Plaintiff was prescribed Depakote and Wellbutrin (Tr. 156). In May, 2001,

treating notes indicate that Plaintiff was "[c]urrently doing well" with a combination of

Depakote and Wellbutrin (Tr. 257). Treating notes from June and July, 2001 state that

Plaintiff was "[d]oing better since off Paxil [and] on Serzone" (Tr. 252).

Just prior to Plaintiff's inpatient hospitalization in October, 2001, his therapist noted

that Plaintiff experienced "ongoing lethargy" and a lack of motivation (Tr. 251). From

October 22 through October 29, 2001, Plaintiff received inpatient treatment after

experiencing sleepy, jittery, confused, and inappropriate behavior (Tr. 169). Dr. Mehta

diagnosed "[a]typical psychosis" and "[p]ossible acute mania" (Tr. 176). Dr. Mehta's

discharge notes state that Plaintiff showed signs of "acute cholinergic reactions [to

medication] which gradually improved" (Tr. 168). Plaintiff was prescribed mood stabilizers

as needed and advised against taking antidepressants (Tr. 168). In December, 2001, two

months after his eight-day hospitalization, treating notes state that Plaintiff exhibited a bright

---

[3]A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ) (4th ed.2000).

affect and appeared "upbeat" (Tr. 249).

In February, 2002, Plaintiff's therapist noted that he was relatively stable (Tr. 248). Also in February, 2002, Jeffrey Parcells, M.D. found that Plaintiff's low density cholesterol count was unacceptably high (Tr. 206). May, 2002 treating notes indicate that Plaintiff felt "lethargic" and "bland," but did not exhibit psychosis (Tr. 247). In November, 2002, Plaintiff again reported feeling lethargic (Tr. 245). In January, 2003, his therapist "[s]trongly suggested" that he participate in activities outside the home, also referring him to a support group (Tr. 244). The following month, Plaintiff's progress was deemed "fair" (Tr. 242). In May, 2003, psychiatrist A. L. Hughett, M.D. noted that Plaintiff currently experienced depression (Tr. 236). In July, 2003, Plaintiff exhibited limited improvement after taking Adderall 15mg (Tr. 230). Dr. Hughett suggested doubling Plaintiff's dose (Tr. 230). At the end of the month, Dr. Hughett reported that Plaintiff was "looking a little bit better" (Tr. 229). Therapy notes from August and September, 2003 indicate that Plaintiff experienced an improved mood (Tr. 227-228). In October, 2003, Dr. Hughett found that Plaintiff was "doing pretty well" (Tr. 223). In December, 2003, Plaintiff reported that he was feeling well, but exhibited slightly manic behavior (Tr. 218). Dr. Parcells' notes from March, 2004 state that Plaintiff experienced shoulder and back discomfort (Tr. 193). In May, 2004, Dr. Hughett, finding that Adderall 30mg was making Plaintiff "a little bit manicy," reduced his dose to 20mg (Tr. 211).

In June, 2004, a CT scan of the thorax should two benign nodules on Plaintiff's right lung (Tr. 189, 296). August, 2004 therapy notes state that Plaintiff's mood was "mixed,"

noting that he appeared generally lethargic (Tr. 344). The same month, Dr. Hughett noted that Plaintiff had "zero energy" and had gained 40 pounds after receiving a prescription for Depakote (Tr. 343). Dr. Hughett's September and November, 2004 records show that Plaintiff was "doing a lot better" (Tr. 335, 339). February, 2005 treatment records show that Plaintiff was engaged in volunteer work (Tr. 327). The same month, Dr. Hughett and/or therapist Tom Verkest completed a "Medical Source Statement," deeming Plaintiff's ability to "deal with work stresses," "function independently," or "maintain attention/concentration" to be poor (Tr. 328). Dr. Hughett opined that Plaintiff's ability to follow instructions was "fair" or "poor" with a poor to non-existent ability to maintain personal appearance, behave appropriately, or be reliable (Tr. 329). Dr. Hughett concluded that Plaintiff was unable to manage his own funds (Tr. 330).

In March, 2005, Dr. Schreck performed an examination of Plaintiff's left shoulder, noting that Plaintiff complained of burning pain (Tr. 298). Dr. Schreck administered a steroid injection without complications (Tr. 299). He also noted Plaintiff experienced "no significant residual symptoms" from an earlier right shoulder rotator cuff repair (Tr. 298).

In May, 2005, Dr. Hughett, noting that Plaintiff was preparing to vacation in Greece, gave him a double supply of medication (Tr. 322). In October, 2005, Dr. Hughett and/or therapist Verkest deemed Plaintiff's ability to relate to co-workers, deal with the public, and use of judgment to be *poor*, but found in all other respects a *fair* ability to make a workplace adjustment (Tr. 309-310). The following month, Dr. Hughett noted that Plaintiff was stable, reporting that "this is the best that I have ever seen him" (Tr. 307). In February, 2006, Dr.

Hughett noted that Plaintiff had been "a little down" since his mother's death in October (Tr. 254). In May, 2006, Dr. Hughett, noting that Plaintiff was having trouble losing weight, observed nonetheless that his condition "seems to be pretty well controlled right now" (Tr. 351). In July, 2006, Dr. Hughett issued an opinion letter, stating that "it does not appear that [Plaintiff] . . . is going to make any appreciable change in terms of being stable enough to be able to go back to work for any appreciable time" (Tr. 361).

### 2. Consultive and Non-Examining Sources

In August, 2004, psychiatrist A. Kumar, M.D. performed a consultive mental examination of Plaintiff on behalf of the SSA (Tr. 280-282). Dr. Kumar noted that Plaintiff had last worked as an academic services officer in 1996 (Tr. 280). Plaintiff denied blackouts or trouble with the law, but reported that he experienced low energy and "no motivation to do anything" (Tr. 280). Dr. Kumar observed that Plaintiff was "in touch with reality," but exhibited poor self-esteem, and "signs of psychomotor inhibition" (Tr. 280). Dr. Kumar assigned Plaintiff a GAF of 46[4] (Tr. 281).

The same month, P. Patel, M.D. performed a consultive physical examination of Plaintiff on behalf of the SSA (Tr. 283-285). Plaintiff reported a history of hypothyroidism, but stated that he now experienced hyperthyroidism (Tr. 283). Dr. Patel, recording that Plaintiff's left knee cap was removed following a 1966 accident, noted nonetheless that

---

[4]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 (*DSM-IV-TR* ) (4th ed.2000).

Plaintiff could walk up to a mile and did not use a cane or walker (Tr. 283). Dr. Patel also noted that following a right shoulder dislocation in 1999 Plaintiff underwent a rotator cuff repair (Tr. 283). Plaintiff reported intermittent shoulder pain radiating down his arm, but denied problems performing fine manipulations (Tr. 283). Plaintiff complained of recent weight gain and fatigue, but exhibited a normal range of motion ("ROM") in all joints with the exception of the right shoulder (Tr. 284).

On September 3, 2004, a Psychiatric Review Technique performed on behalf of the SSA found the presence of bipolar disorder and alcohol abuse in remission (Tr. 130, 133, 138). Under the "B Criteria of the Listings," Plaintiff's functional limitations were deemed either mild or nonexistent, with the exception of a finding of *moderate* deficiencies in "maintaining concentration, persistence, or pace" (Tr. 140).

The same day, a Mental Residual Functional Capacity Assessment found that Plaintiff was *moderately* limited in his ability to maintain attention for extended periods, perform activities within a schedule, sustain a routine without special supervision, interact with coworkers, maintain socially appropriate behavior, and set realistic goals (Tr. 144-145). The Assessment, citing Plaintiff's activities of daily living ("ADLs") noted that he cared for his personal needs, ran errands, cooked, performed laundry chores, and went out by himself (Tr. 146). The Assessment, also observing that Plaintiff's alcoholism was in remission and his mental condition was "relatively stable, found that he was capable of "sustained work activity" (Tr. 146).

A Physical Residual functional Capacity Assessment, also performed in September,

2004, found that Plaintiff retained the ability to lift 50 pounds occasionally and 25 pounds frequently; the ability to walk, stand, or sit for six hours in an eight-hour workday; and an unlimited ability to push and pull[5] (Tr. 149). The Assessment limited Plaintiff to *occasional* climbing, kneeling, or crouching, and *frequent* (as opposed to constant) balancing, stooping, and crawling (Tr. 150). Plaintiff's manipulative abilities were deemed unimpaired, with the exception of a limitation on reaching (Tr. 151). The Assessment found the absence of visual, communicative, or environmental limitations, concluding that "[b]ased on the available medical evidence, [Plaintiff] retains the ability to function within the guidelines of this RFC ["Residual Functional Capacity"] (Tr. 151-153).

### C. Vocational Expert

VE Randy Dulecki, present at the hearing, was not called to testify.

### D.    The ALJ's Decision

Citing Plaintiff's medical records, the ALJ found that although Plaintiff experienced the severe impairment of bipolar disorder "through the date last insured," the condition did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 24). Adopting ALJ Cropper's June 21, 2000 findings, the ALJ

---

[5]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds

concluded that Plaintiff retained the residual functional capacity ["RFC"] to perform semi-skilled, exertionally light work, "including his past work as an academic service officer" (Tr. 25).

The ALJ supported his determination by noting that Plaintiff's April, 2001 treatment was precipitated by his attempt to "wean himself off" his medication, citing hospital records showing that his "symptoms of mood swings, depression, lack of sleep, and inability to function[] coincided with his lack of any medication" (Tr. 25). The ALJ also observed that following the October, 2001 hospitalization for cholinergic reactions, Plaintiff's condition "gradually improved," responding "very well to all modalities of treament . . . and show[ing] good progress with regard to . . . affect, thought processes, demeanor, mood, sleep, and appetite" (Tr. 26). The ALJ cited treating notes which found that Plaintiff's prognosis was "good" (Tr. 26).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

<u>**ANALYSIS**</u>

Plaintiff contends that the administrative decision contains multiple errors. First, he argues that ALJ Wilenkin "erroneously concluded" that "no new or material evidence demonstrated deterioration" in his RFC since the June 21, 2000 administrative decision. *Docket #8, Plaintiff's Brief* at 18. He argues secondly that the ALJ erred in failing to accord controlling weight to the opinions of his treating psychiatrist and therapist. *Id*. at 23. Third, he contends that the administrative findings omit the "credibility determination" required by SSR 96-7p. *Id.* at 26. Fourth, Plaintiff argues that given his limitations as a result of bipolar disease, the ALJ was required to find him disabled at Step Three of his analysis. *Id*. at 29. Finally, Plaintiff contends that the ALJ's Step Four conclusion that he was capable of his past relevant work as an academic services officer is not supported by the record. *Id.* at 32.

**A. Res Judicata**

Plaintiff argues first that the ALJ's October 11, 2006 decision applied the wrong standard of review in determining that "no new or material evidence demonstrated deterioration in the [RFC] since an earlier June 21, 2000 administrative decision." *Plaintiff's Brief* at 18. Plaintiff's contends that "because the time period covered by the earlier denial is not applicable here," the ALJ shirked his responsibility to accept as evidence "any documents that are material to the issues" pertaining to the period following June 21, 2000. *Id*. at 19 (*citing* 20 C.F.R. 404.944).

"Res judicata is a common-law concept which prescribes that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or

could have been raised in that action.'" *Drummond v. Commissioner of Social Security Administration*, 126 F.3d 837, 840 (6th Cir. 1977) (*citing Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 414, 66 L.Ed.2d 308). "Social security claimants are bound by the principles of res judicata." *Id* at 841. "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id* at 842.

First, I disagree with Plaintiff's apparent contention that *Drummond* is inapplicable to the present case. Acquiescence Ruling 98-4, codifying this circuit's decision in *Drummond*, provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in law, regulations, or rulings affecting the finding or method for arriving at the finding.

AR 98-4(6). Thus, the ALJ applied the correct standard of review in denying benefits on the basis that Plaintiff failed to provide "new and material evidence" supporting his claim for the period between June 21, 2000 and December 31, 2001 (Tr. 25).

Second, the ALJ's finding that "[t]here is no new and material evidence to show any deterioration in [Plaintiff's] residual functional capacity" is well supported by record evidence (Tr. 25). The ALJ, citing Plaintiff's April and October, 2001 hospitalizations, noted that both hospital stays were the result of either Plaintiff's attempt to "wean[] himself off of medication," or cholinergic reactions (Tr. 26). The ALJ found that despite the hospitalizations, Plaintiff received a "good" prognosis, "responded very well to all modalities

of treatment," and "as of December 2001 . . . was working on a sculpting project" (Tr. 26). The ALJ also cited records created subsequent to December, 2001 in support of his conclusion that Plaintiff's condition continued to stabilize (Tr. 26).

### B. Residual Functional Capacity/Treating Physician

Plaintiff next contends that the ALJ's citation of only favorable medical reports and omission of negative ones amounts to a distortion of the record. *Plaintiff's Brief* at 23-26. On a related note, he argues that the ALJ's finding that he retained the RFC for light, semi-skilled work is tainted by the failure to accord controlling weight to the opinions of his treating therapist and psychiatrist. *Id.*

In *Davis v. Apfel,* 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001)(Lawson, J.) the court held that "[t]he reviewing court must affirm the Commissioner's findings if they are supported by substantial evidence and the Commissioner employed the proper legal standard." *Id.* The court cautioned, however, that "a substantiality of evidence evaluation does not permit a selective reading of the record." *Id.*

"'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (*citing Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984); *See also Laskowski v. Apfel,* 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000)(Roberts, J.); *Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981)("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record") "Substantial

evidence cannot be based on fragments of the record." *Laskowski, supra,* at 482.

Contrary to Plaintiff's contention, the ALJ's summation of the evidence in support of his non-disability finding amounts to a fair survey of the record. While Plaintiff faults the ALJ for failing to note that he was assigned a GAF of 40-45 at the time of his April, 2001 discharge, treatment notes created in May through July, 2001 indicate that Plaintiff was "[c]urrently doing well" while medicated, and "[d]oing better" (Tr. 252, 257). An evaluation performed in May, 2001 found that Plaintiff's attire, gait, motor activity, eye contact, posture, and communicative skills were all normal (Tr. 257-258). Although Plaintiff exhibited lethargy just prior to his seven-day October, 2001 hospitalization, December, 2001 treatment notes (created just before the expiration of the insured period) describe Plaintiff as "bright" and "upbeat" (Tr. 249). Further, the ALJ's finding that Plaintiff had not offered evidence of physical impairments precluding the performance of his past relevant work is well supported by the record (Tr. 27, 298).

The lessened weight accorded to Dr. Hughett's opinion is also well supported by substantial evidence. While the *uncontradicted* opinions of treating physicians and psychologists are entitled controlling weight, *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991), here, the presence of contradictory evidence allowed the ALJ to accord less than controlling weight to the opinions of Plaintiff's treating psychiatrist and psychologist. *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 (6th Cir. 2004).

The ALJ's treating physician analysis was likewise procedurally correct, noting that

although Dr. Hughett found in July, 2006 that Plaintiff was precluded from all work, the statement "[was] inconsistent with medical evidence showing a stable condition with symptoms controlled by medication" (Tr. 26). The ALJ also noted that although Dr. Hughett found that depression and an "escalating psychotic state" prevented Plaintiff from working, "[t]here is no evidence of psychosis since [Plaintiff's] medication was changed in October, 2001" (Tr. 26 *citing* 361). Plaintiff also argues that the ALJ ignored Dr. Hughett's February, 2005 and October, 2005 statements that Plaintiff's work-related abilities were "fair," "poor," or nonexistent, but cites no law supporting the proposition that ALJ was required to discuss *all* of Dr. Hughett's statements supporting a disability finding.[6] *Plaintiff's Brief* at 24 (*citing* Tr. 309-311, 328-330). In fact, "[w]hile it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Commissioner of Social Security,* 2006 WL 305648, *8-9 (6th Cir. 2006)(*citing Loral Defense Systems-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)). Moreover, having permissibly discounted Dr. Hughett's opinion that Plaintiff was permanently disabled from all work, the ALJ was not obliged to incorporate the treating physician's findings in his RFC.

## C. Credibility Determination

Plaintiff argues next that contrary to the requirements of SSR 96-7p, the ALJ failed to

_____

[6]The February and October, 2005 findings were signed by both Dr. Hughett and Plaintiff's therapist, Tom Verkest (Tr. 311).

make "an explicit credibility determination." *Plaintiff's Brief* at 26. He also contends that the ALJ's reasons for discounting his allegations were substantively inadequate, asserting that Defendant "fail[ed] to provide appropriate evidence to substantiate a lack of credibility." *Id.* at 27.

The credibility determination is guided by SSR 96-7p, which describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques." Second, SSR 96-7p mandates that "the adjudicator must evaluate the intensity, persistence, and limited effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.*

As Plaintiff contends, the October 11, 2006 administrative decision does not contain a statement (as usually found in denied claims) to the effect that the claimant's allegation of disability are not fully credible. Further, the opinion does not mention of SSR 96-7 or its requirements. Nonetheless, the ALJ's omission of an explicit credibility finding does not constitute reversible error. Although not cited, the administrative opinion addresses the requirements of both prongs of SSR 96-7p, first, by acknowledging Plaintiff's history of bipolar disorder and need for medication; then, by finding that the limiting effects of Plaintiff's condition did not preclude his past relevant work (Tr. 25). Moreover, the ALJ implicitly found that Plaintiff's allegations lacked credibility, observing that although Plaintiff

claimed "no improvement since his 2001 hospitalization," treating notes suggested that his condition continued to improve (Tr. 25-26); Section **B**., *supra*.

Plaintiff's current claim is undermined by additional record evidence. Although Plaintiff alleges that his condition precludes all work, treating notes show that he was able to plan and take a successful pleasure trip to Greece in July, 2005 (Tr. 315). Treating notes from August, 2005 show that Plaintiff confessed that when his wife's warnings to stay out of the sun or take his medicine became tedious, he simply "tune[d] [her]," out despite the fact that he was aware that his unresponsiveness led her to believe that this behavior was a facet of his illness (Tr. 315). Plaintiff testified at length as to his purported belief that government agents were monitoring him and his suicide ideation (Tr. 379-382). However, when asked if he agreed with recent treating notes showing improvement of his condition, Plaintiff exhibited the presence of mind to challenge the ALJ's interpretation of the newer medical records (Tr. 384).

Finally, the need for an "explicit credibility determination" is obviated by the fact that the June 21, 2000 administrative findings (adopted by ALJ Wilenkin in light of the absence of "new and material" evidence) include a thorough credibility analysis (Tr. 51-54). For this reason and because the October 11, 2006 opinion contains a *de facto* credibility finding, the mere failure to mention of SSR 96-7p does not constitute reversible error.

### D. A Listed Impairment

Plaintiff argues next that the ALJ erred in failing to find him disabled at Step Three of the administrative analysis. *Plaintiff's Brief* at 29. Specifically, he contends that as a

result of bipolar disorder he meets the requirements of Subpart B of Listing 12.04 ("B Criteria"). *Id.* Plaintiff cites the report of his former wife in support of the proposition that he experiences marked restrictions in both activities of daily living and social functioning. *Id.* at 29-32.

Listing 20 C.F.R. part 404, Subpart P, Appendix 1, 12.04 (Affective Disorders) states in pertinent part:

> *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions or paranoid thinking;
>
> *And*
>
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
> 4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to

experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

No one disputes that Plaintiff has experienced longstanding limitations as a result of bipolar disorder. However, substantial evidence supports the ALJ's determination that Plaintiff's condition did not satisfy the "B Criteria" requirements for a disability finding at Step Three. First, a September 3, 2004 Psychiatric Review Technique found that under the "B Criteria" Plaintiff's daily living and social functioning limitations were *mild* (Tr. 140). Because Plaintiff did not receive a finding of *marked* limitations in two of the four "B Criteria" categories (as required for a Step Three determination) the ALJ's non-disability finding was appropriate.[7]

Further, Plaintiff's former wife's account of his activities does present overwhelming proof that he was disabled at Step Three. The report completed by Helen Lena Hatzichronoglou, noted that Plaintiff generally arose late, but also noted that he regularly performed errands, listened to music, attended to his own personal care needs, mowed the lawn, prepared meals, drove, and shopped (Tr. 103-105). Ms. Hatzichronoglou's observations that Plaintiff messed up the kitchen when cooking, needed reminders to get his hair cut, socialized only once or twice a month, and lacked financial judgment do not establish that he experienced *marked* daily activity or social limitations (Tr. 103-105). Although Plaintiff

---

[7] The September, 2004 evaluation found the absence of episodes of decompensation of extended duration (Tr. 140). Although Plaintiff experienced decompensative episodes in both April and October, 2001, neither was for an extended duration. Further, both episodes were alleviated by medication adjustments.

again cites Dr. Hughett's February and October, 2005 and July, 2006 assessments in support of a Step Three finding, for the reasons discussed in Section **B.**, *supra*, the treating source findings are entitled to only limited weight.

### E. Past Relevant Work

Finally, Plaintiff argues that the ALJ erred in finding that he was capable of performing his past relevant work. *Plaintiff's Brief* at 32. Plaintiff asserts that the position of academic service officer, as performed, "required lifting up to 100 pounds," pointing out that his RFC indicates that he can perform only exertionally sedentary or light work. *Id.* at 33 (*citing* Tr. 95).

This argument is without merit. First, as discussed in Section **A.**, *supra*, the absence of "new and material" evidence between June 21, 2000 and December 31, 2001 mandated the adoption of the previous administrative findings. AR 98-4(6). The error, if any, would be assigned to the June 21, 2000 findings which were not timely disputed by Plaintiff. Second and more obviously, the earlier decision did *not* conclude that Plaintiff could perform a job requiring 100-pound lifting but instead, based on the testimony of the VE, found that Plaintiff could perform "his past relevant work as a academic services officer *as that work typically is performed*, at the light [exertional level]"(emphasis added). At Step Four, the Commissioner considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. SSR 82-61. If not, the Commission considers whether the claimant can perform the functional demands and job duties of the occupation as generally required by employers throughout the national economy.

*Id.* The ALJ permissibly found that Plaintiff was not disabled on the basis that he could perform the job of an academic services officer as typically performed, *i.e,* at the light exertional level.

Plaintiff, noting that the job title "academic services officer" is not found in the Dictionary of Occupational Titles ("DOT"), speculates that the position is *skilled* rather than *semiskilled*, arguing as such that his RFC for semi-skilled work is inadequate to meet the demands of his former job. *Plaintiff's Brief* at 34. Again, the June 21, 2000 decision, adopted by ALJ Wilenkin, provides illumination, adopting the VE's testimony that the job of academic services officer is generally performed at *either the skilled or semiskilled* level (Tr. 52). Because a review of the June 21, 2000 decision shows that the Step Four determination was both procedurally and substantively correct, a remand is not warranted.

In closing, the finding that the ALJ's determination should be upheld is not intended to trivialize Plaintiff's legitimate impairments as a result of bipolar disorder. However, based on a review of this record as a whole, the ALJ's decision is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level pursuant to *Mullen v. Bowen*, *supra*, and should not be disturbed by this Court.

## IV. CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen _____
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: September 24, 2008

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 24, 2008.

s/Susan Jefferson _____
Case Manager